in Reed Hospital v. Conifer Revenue Cycle Solutions, No. 201735. Mr. Paul, with you for Reed Hospital. Yes, thank you, Your Honor, and may it please the Court. Conifer contracted with Reed to collect revenue for Reed Services according to best industry practices, and in exchange,  Conifer did not collect revenue for Reed Services according to best industry practices, thus breaching the contract. Given the procedural posture of this case, that much has to be assumed. So at bottom, the issue here is whether there's a genuine issue of material fact as to whether Reed is entitled to seek recovery of at least some of its claim damages, including the revenue it lost as a result of Conifer's breach. There is a genuine issue of material fact on damages, and so Reed is entitled to a trial, and the Court should reverse. May I ask you about a particular clause, please, in the agreement? What about the clause that states, quote, under this agreement, Conifer does not guarantee the collection of any accounts receivable. How does that clause factor into whether Reed can collect for lost revenue? What I think that clause means is that simply because Conifer fails to collect on a particular account receivable, it cannot be held to have breached the contract, but that does not mean that it cannot be held liable for breach. If it otherwise breaches the contract, for example, by failing to adequately staff the project such that it can timely and adequately collect on accounts. And in fact, Conifer, in its reply brief on summary judgment in footnote 5, specifically said 14.1a does not prevent a suit for breach of contract based on actual non-performance. So I think the parties are in agreement on that point, Judge Roeper. Thank you. All agree, likewise, that lost revenue damages can be either direct or consequential. So I think the debate really comes down to whether the contract's limitation on consequential damages precludes recovery of even direct lost revenue damages, and it doesn't. Specifically, what the contract says is that absent willful misconduct, the party can't collect indirect, incidental, special, or consequential damages, including without limitation lost revenue, whether or not such damages are perceived. The words including without limitation lost revenue clarify that to the extent certain lost revenue damages are consequential lost revenue damages, they're not recoverable. In other words, this language merely refers to a subset of lost revenue damages, that is revenue lost indirectly as a result of the breach, but it doesn't preclude the recovery of lost revenue damages to the extent they constitute direct lost revenue damage. Well, under this contract, Conifer's performance was measured in terms of revenue, correct? Correct. And is there any more direct form of performance than collection of revenue under this contract? Not under a revenue management cycle agreement, no, Your Honor. Could I ask you about this concept of willful misconduct here? As I understand it, that is relevant whether we're talking about direct or indirect damages under both 14.1 B and C. And I have to say, I've really struggled with the notion of willful misconduct in the concept of contracts here, when we're not talking about independently tortious wrongs. I've got, I can approach this in several ways, but one would be to ask, how do you think a jury ought to be instructed on the issue of willful misconduct, if this case were to go to trial? Well, I think the basic question boils down to, and I think this would be captured in the instruction, and that is, you know, first of all, has Conifer committed an intentional act that violated the contract, number one, and number two, did it do so with reckless disregard for the consequences? We don't have to show. Well, I mean, let's take a different kind of contract, let's say just for the sale of goods, and we're all familiar with the notion of an efficient breach, and a seller just says, we're losing money on this, we're out, we're terminating this contract, cover as best you can. And we think you can cover more efficiently with somebody else than with us, because of changes in shipping costs or God knows what. That's intentional, and it's a breach. It's hard to treat that as willful, as wrongful, right? Well, no, I think it is intentional, and that's ultimately what matters. Just briefly, Your Honor, I just want to clarify, this would be a bench trial, so it would not be a jury trial. That's number one. Number two, in a classic... Then we're just postponing the problem, so... Well, maybe, but in a classic efficient breach situation, you have someone who decides to stop performance and move on and make a clean break, understanding that they're going to have to make the non-breaching party whole. That's part of the bargain of an efficient breach. That is an intentional act with regard for the consequences. Contrast that with what happened here. Here, Conifer strung Reid along for nearly two full years, failing to properly staff the project, knowing all along that its doing so was harming Reid. It knew this not only because its employees told it so, but because Reid told it so. And then on top of that, in the spring of 2014, it came back to Reid and said, you know what, we'd like to renegotiate this contract, and we'd like to do less for more. That is an intentional act without regard for the consequences. They are continuing throughout to intentionally and chronically understaff the project, full well knowing that it's harming Reid. Okay, so for example, I take it... You could deal with that issue, for instance, if... Conifer had let go of... All but five of its 157 overwhelmed employees that Dell was using and barely getting by with. That would be willful. Certainly intentional. That would be willful. The district court, in your view, of course, was incorrect to conclude that as a matter of law, Conifer's misconduct was not willful. Correct. Yeah, because Conifer had actual knowledge of the probable consequence. It unquestionably did. Yeah, and an opportunity to avoid the risk. And that seems to be the definition of willfulness in Indiana. That's your argument. That's exactly right. Intentional conduct in violation of the contract with reckless disregard for the consequence. And so let me, if I could, elaborate a little bit on that specifically in this case. We've got all of this evidence in which Conifer is intentionally and chronically understaffing its work. But on top of that, we know it led to at least three consequences. One was an increased average length of stay, which meant that Reed was being underpaid for its services for patients on government insurance. And we have an email showing that Conifer knew real-time that understaffing was leading to an increased length of stay. For government-insured patients, they're insured based on diagnosis, not on how many days they stay in the hospital. So average length of stay really matters something to a hospital. Secondly, this intentional understaffing led to a failure to timely and accurately code bills, which led to a backup in timely and accurate billing. And again, we have evidence that Conifer knew real-time that the lack of coders it had led to a soaring discharge but not final bill number, which is a key industry metric. In fact, it was three times the national average at one point. And we also have evidence that Conifer knew that its failure to code bills led to a $5 million loss because those bills were never submitted. And the third consequence that this understaffing led to was a failure to timely follow-up on claim denials, which precluded Reed from obtaining reimbursement for some of its claims. And again, we have evidence that Conifer knew real-time that its staffing shortages had a severe effect on its ability to manage claim denials. So, in short, what I'm saying— Can I ask you a question against the backdrop of those facts? And it's helpful, in my view, that you set those metrics forward. One of the things that I've struggled with here is it looks to me from the record— and I'm thinking specifically of the expert report that was submitted by this fellow, Chip Hurley— that during the period that Conifer had the account, that they received incentive payments, including a few that look fairly sizable, across the quarters. And so, what I was trying to make sense of is the allegations that Conifer essentially abandoned Reed by the chronic understaffing, etc., as measured by these metrics. But at the same time, Conifer is realizing bonuses on the engagement. Are those two things at odds with one another or not? Not at all. A couple of things. Number one, the fact that it was earning these performance incentives is not suggestive that it was performing according to best industry practices. And if you look at Reed's CEO's deposition, Craig Kenyon, he testified that these performance metrics were designed to be what he called the canary in the coal mine. They were to ensure that Conifer was performing at a bare minimum, and that if it didn't meet those performance metrics, Reed could end the contract without penalty. That's point number one. Number two, Conifer makes, and this is a related point, Conifer makes a big deal out of the fact that it collected $10 million more in revenue than what it says Reed and Dell would have collected during the same time period. Again, that's not suggestive of best industry practices. That represents a less than 1% improvement over the Reed-Dell baseline, which was rather meager. As Conifer wrote in its own summary judgment motion, when it took over the revenue cycle management process, Reed's revenue cycle was struggling. That's its words. And its financial performance was poor. Yet this is the baseline against which Conifer is comparing its conduct. So in short, Judge Scudder, the earning of these incentives against bare minimum practice metrics and the collection of additional $10 million is not inconsistent with the notion that it is chronically and intentionally understaffing the project, all the while knowing, over the two years of its tenure, that doing so is having real harm. It's causing real harm to Reed. Can I follow up on the damages question with respect to Mr. Brun's calculations? Because I understand kind of some of the specific categories of errors you're talking about, but Brun seems to be focusing on aggregate data, overall collections. But I would expect, if you're looking at aggregate accounts, you're going to find, you should expect to find some adequate performance, some better than average, and some below average. And the Conifer is telling us that his use of the green and red categories along those lines basically amounts to unfair cherry picking. What do you, can you respond to that? Because it concerns me about that method. Yes, Judge Hamilton. You have to remember that Conifer was hired to collect close to 100% of the chargeable amounts on close to 100% of the accounts. That is the definition of best industry practices. As accounted for in Brun's own report, he deducted about $6 million because even the best hospitals have what he called a 1% leakage rate. So the fact that Conifer may have collected well enough on certain accounts does not entitle it to a credit or wash clean the fact that in nearly 50,000 instances, on nearly 50,000 accounts, it collected nowhere near well enough. So that's how you reconcile those two points in Mr. Brun's report. I would, did you want to follow up? If I could just briefly, we may, Judge Scudder, we may need to go a little beyond 20 minutes on this one with your indulgence. But the, another way of expressing this concern, I guess, is that I can see kind of a category by category form of damages, loss revenue because of delays in coding or delays in claim prosecution or claim appeals and so on. But then you've also got Brun's using this kind of aggregate measure and it seems to me like there's kind of a built in, maybe solvable, but built in problem of potential double counting there using the aggregate measure and then the category by category. Well, I mean, certainly that would be a discussion for trial, I suppose, but you have to remember why Mr. Brun's took the approach that he did. And that is, again, because Reed had almost 400,000 patient accounts during Conifer's tenure. And so it would have been all but practically impossible to track the many thousands of instances in which Conifer's employees failed to fulfill a specifically delegated duty and then connect those individual breaches to a specific dollar loss. And even if it were possible, the cost of calculating those damages might exceed the amount of lost revenue. So this explains why Mr. Brun's took the approach he did and why he estimated damages based in part on categories, based in part on aggregate data. He compared Conifer's performance against the Reed-Dell baseline, which again, you know, I have to emphasize, Conifer acknowledged that when it took over, Reed and Dell were performing rather poorly. But yet this is the baseline against which Conifer's conduct is being compared and it's barely earning or barely collecting more revenue than what Reed and Dell would have collected. Thank you. And thank you, Judge Rovner, for letting me follow up. Oh, my goodness. Thank you for being my brother. You too, Judge Scudder. I have a two part question. If this case were remanded and the district court found a breach, but no willful conduct, do you concede that 14.1c would limit Reed's recovery to whatever it paid or was paid for? Well, it was supposed to pay to Conifer under the contract. And part two of my question is, how does this number compare to Reed's total claim damages? Okay. Sure. First of all, yes, I think we do concede that. There has to be willful misconduct or gross negligence in order to allow us to recover damages in excess of the cap. So if the court did not find one of those two things, then we would be limited by the cap. Number two, I believe, and I should have double checked this, but I believe that Reed paid Conifer over its near two-year tenure approximately $9 to $10 million. $9 to $10 million a year, wasn't it? Yeah. It was, yeah, and I may be undercounting there. The payment schedule is set forth in Schedule D of the contract. And over the seven-year anticipated length of the contract, it was going to add up to about $60 million. So, but it was about $8 to $10 million a year, the payments that Reed was making. So, and then how does that compare? Oh, yes, I'm sorry. I believe that Mr. Bruns calculated a total of $49 million in damages and lost revenue and other categories of damages. And the way you get that, he has a, if you look at his expert report, there's a bottom line number of about $60 million. And if you discount from that, the 1%, what he calls leakage, that even best hospitals have, about $7 million, you get to about $49 million, I believe. And your cap would be? Again. 14.1C. I'm trying to. Do the math. Yeah. Yeah. Unfortunately, I don't remember precisely how much we get paid, Conifer, by the time. I'm sure it's in the record. But assuming no willful misconduct or gross negligence, it would be limited by that. Okay. Thank you. Okay. Mr. Paul, at this point, we'll push the pause button. We'll come back to you for a few minutes of rebuttal. And why don't we turn to Mr. Rutherford? Good morning, Your Honors. Sam Rutherford on behalf of Conifer Revenue Cycle Solutions, LLC. May it please the court. The outcome in the district court here is exactly what was bargained for in the party's agreement. Reid brought this case seeking categories of damages that are barred by the limitation of liability in that agreement. And Reid sought to avoid those limitations of liability by alleging willful misconduct. But discovery disproved the allegations of willful misconduct. And Reid came to summary judgment with no evidence of willful misconduct. Certainly none that would create a genuine dispute for trial. So summary judgment was appropriately granted to Conifer. Well, forgive me. But, Mr. Rutherford, I am wondering why this is a summary judgment case at all at this point. It seems to me that the briefs are filled with many factual disputes. For example, Reid says that Conifer cut staff to reduce costs. Conifer says it did not. Even the main premise is fraught with disagreement. Did Conifer collect more or less revenue during its tenure than in the time periods before it assumed the contract? So that is why I am asking you, why is this a summary judgment case? There are issues here. Your Honor, I'd have a few responses to that. The first is that I think there are legal issues regarding the application of the limitations of liability that were correctly applied by the district court. With respect to willful misconduct, I do not think that's what's going on here is a selection between competing narratives. Rather, what Conifer's arguments do and what the district court's analysis did was look at the evidence and roll up the sleeves at summary judgment to cite a case in Reid's brief. To determine whether or not there's a genuine issue of disputed material fact. And what I would say is that what we know from discovery and what we know from the record is that there is not evidence of willful misconduct. And there's a few reasons why. One is when we took the deposition of Reid's corporate representative on this exact issue, he did not identify anyone who had engaged in willful misconduct. When he was pressed for evidence of willful misconduct, what he pointed to was a pile of allegedly written off claims that Reid built its case on from its original expert report that was thoroughly debunked and abandoned in what was supposed to be the last week of discovery before summary judgment. And instead, what we found in discovery is after Reid alleged that we were overpaid for incentive fees, that Reid abandoned that claim as well. Conifer performed and got incentive fees. And then comes Mr. Bruns' analysis. And Mr. Bruns comes in and says, shows that Conifer collected hundreds of millions of dollars. Collected millions in excess of what Reid's own rates would be. Excuse me, Mr. Russell. Yes, Ron. Could we focus on the issue under the contract in particular in 14.1B? And in particular, I guess the name of the defendant is Conifer Revenue Cycle Solutions. The performance you all provide is revenue, right? Not quite, Your Honor. This contract is not a contract to deliver revenue. This contract was a much broader contract for revenue cycle services that included things like a centralized or excuse me, a preregistration department and included things like coding. Sir, I'm not talking about the services. I'm talking about measuring the performance. Is there any measure better than revenue? Well, Your Honor, this contract had several metrics, only one of which I believe was cash collections. And cash collections was actually a metric for which Conifer received incentive payments on numerous quarters. And so I don't think it's. Sir. Yes, Your Honor. You agree we have to assume there's a breach here? I think for purposes of the analysis on appeal, the issue of breach is not on dispute. But what I think that Reid has. Sir. But Reid is not. Sir, please bear with me for a moment. Yes, Your Honor. So we have to assume there's a breach. And is there any more direct form of damages for breach of these services than loss of revenue? Well, Your Honor, I do not think that those are direct damages for a few reasons. First off. Yes. Answer the question I asked. Is there any more form of direct damages? Which apparently the contract does contemplate, right? Your Honor, I think that the more direct form would be a refund of these. And for example, Your Honor. No, no, no. That may be a measure of damages ultimately. But what form of damages would that take? Anything more than the performance of delivering cash into the accounts of Reid Hospital? I do not think that is a direct measure of damages. At least not based on the record that Reid has put in regarding the damages. Get away from the record. Bear with me. Just hypothetically. Take Judge Rovner's hypothetical to Mr. Paul. That you all decide to cut back from 150 to 10 employees. Revenue collections drop. Assume that's a breach. Forget about whether it's direct or indirect. Well, no. Is there any more direct measure of damages from that breach than the drop in revenue? I do not think that is a direct measure of damages. Because of the nature of the payments would relate. What is the more direct measure? Or a direct form of damages? Other than lost revenue here? I believe it would be the refund of fees like it was in Rex Norton. As was suggested in the district court here. And your honor, one of the reasons I say that. The breach of the Viastar case that your honor authored when you were on the district court. And there, the revenues in the contract, you determined to be direct revenues. Because in part, the damages cap there was tied to sales commissions that the parties agreed on in advance. Here, the opposite is true. The damages cap is explicitly based on fees paid. And so, therefore, I think that that indicates a different level of reasoning for this contract. That assumes the direct damages could exceed the fees, correct? The category? Yes, your honor. So, what would that be? Well, there would be a number of ways. One would be that this is limited to one year of fees. They could not receive seven years of refund. I know. Let me try again. Let me try again, sir. We seem to have a bit of a delay. But I'm having trouble here. I guess because the contract clearly contemplates direct damages that can exceed fees. That is possible under 14.1c if willful misconduct or gross negligence is shown, correct? Yes, your honor. Okay. And so, what I'm struggling with, and I'll try it one last time. And then I'll let you off the hook. Or whatever it is I'm trying to find here. To come up with some form of direct damages other than lost revenue. And your honor, the other forms of direct damages. I mean, an example would be if, for example, a Conifer employee stole from Reed. Or if a Conifer employee damaged some very valuable equipment within the hospital. Accountants run amok in the hospital with sledgehammers or something. I mean, okay. If that's your best example, that's your best example. It's in your brief and I'll leave it at that. Well, your honor, if I could respond to the point more broadly. What Reed argues in their reply brief about why these damages are direct. Is Reed says that if Conifer fails to send a bill or Conifer fails to pursue collections. Then the direct damages would be lost revenue. And what we say to that is that it's undisputed in the record here. It's in our statements of undisputed material fact and Reed's responses which we cite. That Reed's damages in this case are not based on any review of what happened with any account. What Conifer did with any account. What Conifer failed to do. What anyone else did with that account. And so if their theory of direct damages is you failed to send a bill. Therefore we were damaged. There's no evidence in the record to support that theory of damages. Instead what they have is an amalgamation of averages. Which actually shows that we exceeded the bar that they chose for those averages. And they say that due to some generalized substandard performance. That those collections were in some way depressed. But those payments were based on determinations by those third party payers. Under the various circumstances. That is not a direct damage. That is alleged damages based on the results or consequences. Based on those third party determinations under contracts or other arrangements with Reed. And we cite second circuit cases. And I think it's consistent with Indiana case law. That where the damages are flowing from that determination under a separate agreement. Then it's not direct. And here. Is there any evidence that anything about those practices changed dramatically. Between the baseline that Bruns used and the 23 months that Conifer served here. In terms of what Conifer's performance or in terms of how the payers paid. How payers paid. Mr. Bruns testified that he made various adjustments for changes. But I don't think that he didn't purport to account for everything. If that's what your honor is asking. Do you all have evidence that he failed to account for something significant? Well your honor. What I would say is that the collection rates increased. And so I think that the opposite. Is a gross level? Or. What I'm saying is. $10 million extra. Yes your honor. That we exceeded the historical rate by $10 million. And so. I don't think they show a depressed rate of collections regardless. And if I could explain. If I could Mr. Rutherford. Let's bear with me with the hypothetical. But let's suppose. And I'm going back to how to interpret 14.1 B and C. Suppose evidence showed that Conifer employees who were overworked. Stuck $5 million worth of bills into a drawer. Never tried to collect them. And let's assume that's a breach. What would the damages be? And would you treat those as direct or consequential or indirect damages? And why? Well your honor. Under 14.1 B. I think that all lost revenue damages are treated as consequential damages. And that's based on the reading of the whole provision. Including that lost revenue was specifically identified. Rather than parenthetical being left out. And I'm sorry.  There's a lot of damage that goes into this. Including the language that takes foreseeability off the table. We're not to come in and say these damages are so foreseeable. That they shouldn't be subject to this. And then I would also say, we note on page 24 of our brief. That in your in your view, then there are no damages available for that breach. Is that correct? Your honor. That's that's I was going to get there. I apologize if I wasn't getting there quickly enough. The third point that I was going to say about why those are not direct damages. Under 14.1 B. Is that. As we point out on page 24 of our brief. A distinction between the pin crow type cases. And this case. Is that the cause also carves out reads payment obligations. Which would clearly be a type of direct revenue damages. And so the parties would not have carved that out of 14.1 B. If. They did not understand that lost revenue to be. A word to be broader than just some level of consequential damages. So to the, your point about the bills stuffed in the drawer. Which I think is what read is trying to do with that $5 million email. Which I don't think is evidence of anything. But the $5 million in bills gets put in the drawer. And if you're saying it got put in the drawer. Intentionally by the counter for employee to hide something that they had done. Or some other willful. Make it not. We'll make it not willful. It just happens. They're overworked. So if a counter for employee messed up and a bill did not go out. Then I think the clear intent of this contract. Is that that is not recoverable as damages. That's 14.1. A that's 14.1 B. We are not a guarantor of collections. We can't make sure that every person does every single thing. Right. It's not strict liability in the performance of these services. That's not. That's really a straw man. Is the argument is not. That the, you know, the, the, the patient was bankrupt or anything. The argument is. That you all didn't take the very first step for collection. Namely to send the bill out. You're saying there is no remedy for that. I'm saying if there was willful misconduct or gross negligence. Then there could potentially be a remedy. But if a counter for employee makes a mistake. And it results in lost revenue. Then under this agreement, they did not intend for conifer to be responsible. I think. There can never be actual non-performance. It's always going to be. Conifer was just sloppy and slow or. Conifer was making. Merely making business. Decisions. Well. To me. You're actually saying. What are you actually saying? What I'm saying, your honor, is that in this case. There is no evidence that creates. A genuine dispute of willful misconduct. And that the provisions of the limitations of liability. Sought to avoid a scenario. Just like this. Where Reed takes a generalized. Theory of damages. That is not based on anything. Conifer did or did not do with respect to any account. Marries it up with a few emails. And then suggests. That conifer engaged in some broad scheme. For which it should pay damages. Which are essentially just. And the alleged damages. Are just what's barred by 14.1 a. Which is a baseline rate of collection. Whether any. Whether any particular damage. Is direct or consequential. Okay. Is that a factual question or a legal question? In this case, your honor, I believe it's a legal question. Read sites a case where it was. There was a remand on that issue. And it was where there were particular buckets of damages in that case. Where the court determined that there was an issue in the record. That would need to be resolved. At trial and here. I think that the nature of the damages, particularly given the. The statements of undisputed material fact that went undisputed at summary judgment. That show that to determine. Why any account. Was paid what it was paid. You have to look at the details and it's undisputed. They did not look at the details for any. Of those accounts. And they don't base it on anything that conifer did or failed to do. Or that anyone else did or failed to do. I think. It's undisputed that they did not even look at what caused any of these particular damages. Mr. Rutherford.      Mr. Rutherford. Can I. Part of part of it might be. A shifting of gears, but can I share an impression with you? And guess where we get the benefit of your reaction to it. One of the things that I've struggled with. Is embedded in one of the observations that judge Roe. Made early on. When I look at the. The record here, which I've tried to do. In some detail. I see. The two letters. From Mr. Rutherford. To the chief executive officer. Is it Kenyan? The chief executive officer. Raising real. Concerns about staffing. I'm aware of Mr. Snow's email from may of 2014. There's. A lot of back and forth. About what happened with this. Woman named Shannon Gill. Who was in. Some kind of managerial position. Related in one way or another. To revenue and she went over to take on. The story and computer project. Et cetera, et cetera. And what I see going on. Between the red brief. And the blue brief. Is tug of war. On what inferences to draw. From those facts. That. That's my that's my candid. Kind of take on reading the briefs. You know and one of the one of the things. That you may have going for you. Is just. The height of the burden of showing. Willful misconduct. It's not an not an easy thing to show. And that may be at the end of the day. What saves you. But can you react to my impression. That there's tug of war on facts. And that suggests to me a jury question. But your honor. To two points. The first one is yes. I agree that the standard is very important here. And that when you have people at. Conifer who are wrestling with the fact that their. Companies losing hundreds of thousands of dollars every month. And continues to spend more than they'll get paid. It's a very difficult circumstance. And I don't think that. You can quickly leap to an inference of. A reasonable inference of willful misconduct. But in terms of the tug of war. What we tried to convey in our briefing. Is that this is not about choosing between narratives. And choosing between. The reasonable inferences to the. You mentioned that. Mr. Snow email. That's a great example. He lays out a bunch of things. But in particular says we need to get additional coders. And it's undisputed in the record that within two days. I believe with that email. They had the coders. And so what inference of willful misconduct. Can be drawn when someone raises a problem. If there's not also evidence. That that problem was then recklessly disregarded. And that's the point with that H. I. M assessment. They tout the H. I. M assessments. But the confer leadership sent experts to read. To look at the situation. And the December one that they cite. Says that a new director had already was lined up. And was going to start. And so your honor that while it may feel like tug of war. It feels a little bit like whack-a-mole to us. In the sense that things get brought up. And then we have to show. That they're not actually supported in the record. Or they certainly are not evidence of any intentional. Reckless disregard that would constitute. Okay. I'm sorry. If I could just follow up on that. You pointed out Mr. Rutherford, how much. In general terms. Conifer was losing on this contract. I haven't. I don't understand this yet. Why didn't you just terminate it? Well, your honor. They had hoped to. Have a positive relationship out of this. I mean, I think the testimony is clear. That they had a plan to break even. That was based on. Reducing some third party vendor expenses. And on achieving more performance incentives. And that by driving even better performance. And getting more performance incentives.  And then what they want to do. With read that Mr. Paulson. I don't think the record. Supports that they were offering to do. Less work for more money. They actually wanted to change which departments. And they were going to take on. Significant patient. Access the admission and registration functions. That were within read. While being paid the same amount. So they kind of. Wanted this to work out. And when they had the change of leadership. The I mean. The timing here. It's a 23 month period. They are getting their arms around it. For that first year or so maybe. And then they're looking for ways. How can we make this work with read? How can we make a win win? Okay. Sorry there's one last question if I may. That really needs to be addressed. To both sides as well. A great deal of the material here. Mr Rutherford is under seal. Including as I understand. Even the contract itself. In terms of. Our obligations to. To the public. Is there anything in your view that needs to remain. Under seal at this point. Or that we need to be careful about in writing. An opinion. Whichever way this comes out. Thank you your honor for raising this. Within our briefing. Both sides briefing. The only things that are currently redacted. Are a few of the financial figures. A few of the reads financial figures. That are in Conifer's brief. In terms of the contract itself. Within the district court record. Any portion that's in our briefs. Is clearly. Already in the public record. And that's in part based on. There's a redacted version. In the district court docket. That is not where every page is just redacted. It's just certain terms that are redacted. The entire limitation of liability provisions. Are in the public record. Where do we find that redacted version. In the district court. I have it right here your honor. If you can give me. Sure. Not a memory. Sure your honor. If your honor wouldn't mind. If Mr. Paul wants to finish up. I'd be glad to give you that record side at the end. Without raising any additional argument. If that would be a benefit to the court. That's of course fine. Thank you Mr. Rutherford. Mr. Paul will return to you. You reserve three minutes. We've gone over just given the complexity of this. So I'm going to give you your three minutes. Okay. Thank you your honor. First on the ceiling question. Judge Hamilton. We only asked that one document be kept under seal. The expert affidavit of Jeffrey bronze. I could explain why we did that. But at this point, given how old that data is, the client doesn't even care. If that data is made public. Conifer is the one who is, is wanted to seek. To keep under seal. Most of the documents apparently, because it doesn't want the public to understand just how badly. Formed under this contract. Now on the merits. First, these are direct. Read hired Conifer to do things that would lead to the collection. Of revenue, according to best industry practices. That was reads expectation. So if they didn't do those things, the natural indirect loss. Was lost revenue and nothing prevents us from seeking the benefit of our bargain. Sure. We could seek a refund of our fees, but that's a restitutionary measure of damages. We're entitled to pursue the benefit of our bargain. The second point on the merits. There is a question of fact. Misconduct and gross negligence. This is a tug of war about competing narrow narratives and inferences. We have shown unquestionably an intentional act of short staffing. And I encourage you to look at the affidavits that are in our appendix on that point in particular. Shannon Gill. And we have also shown a question of fact on whether this act was done with reckless disregard for the consequences. And in particular sections. Two point B one and two point B two. In our brief. Site evidence showing that re excuse me. Conifer knew real time that while it was having these staffing issues while it was refusing to staff the project, it was harming read. And yet you continued to understaff the project. That is reckless disregard for the consequences. And then finally on the issue of causation. We did not have to eliminate all other possible causes to show a genuine issue of material fact. And in fact, to judge Hamilton's question about, did anything change? No, there was no evidence that anything changed. The only, and Conifer didn't put forward any evidence that anything changed. The only thing that changed was that Conifer took over the revenue management cycle process. And the only thing that changed was that Conifer's conduct was a substantial cause of reads damages. Not the only cause, but one substantial cause. And we've done that. It is at least a reasonable inference. The Conifer's breach was a substantial cause of reads losses when it was higher to do certain things, to collect revenue. And then revenue is lost. And as I say, indeed, even kind of itself. Connected the causal dots in real time. We would respectfully request the court to remand for a trial in reverse. Thank you. Thank you, Mr. Paul and Mr. Rutherford. Did you have a chance to look at the site? Yes, your Honor. The, the redacted master services agreement, at least the one that I located is docket 85 dash one with the limitations of liability at ECF page 26. And I, and I will correct myself that that document is more heavily redacted than I recall. But the, the provisions that we've discussed today are publicly disclosed in that redacted version. And, and we have detailed motions to seal on any of these things. If you have questions about them to your question about the concern, there are documents in the record that have HIPAA and other protected information, which is part of why they were sealed. I don't think that touches on anything we've discussed today or would need to be disclosed in any event. Okay. Thank you very well. Yeah. Thanks to both parties. We'll take this case under advisement. The court's going to take a 10 minute recess before we proceed to our third argument in the morning. Thank you.